# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

**BILLIE LOU MILLER**                    **CASE NO.  5:22-CV-00335**

**VERSUS**                              **JUDGE TERRY A. DOUGHTY**

**KAREN J MILLER**                      **MAGISTRATE JUDGE HORNSBY**

## MEMORANDUM OPINION

A bench trial was held in this proceeding in Shreveport, Louisiana, on October 16 and 19, 2023. This Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I.   FINDINGS OF FACT[1]

### A.  Separation and Reconciliation of Billie Lou Miller and Travis Alton Miller

Billie Lou Miller ("Billie Lou") married Travis Alton Miller ("Travis") on or about June 28, 1997.[2] Karen J. Miller ("Kay") is Travis's biological daughter and Billie Lou's stepdaughter.[3] Maria Larocca ("Maria") and Miranda Larocca ("Miranda") are Kay's daughters.[4] Pamela Jean Clark ("Pam") is Travis's adoptive daughter and Billie Lou's stepdaughter.[5] Matt Clark ("Matt") is Pam's husband.[6] Luke Thaxton ("Luke") is Pam's son.[7]

---

[1] No transcript was ordered for testimony at trial. The Court used its contemporaneous notes regarding the testimony to supplement the admitted exhibits.
[2] [Doc. No. 64, § D, ¶ 1].
[3] [Doc. No. 64, § D, ¶ 3].
[4] [Doc. No. 64, § D, ¶ 6].
[5] [Doc. No. 64, § D, ¶ 4].
[6] [Doc. No. 64, § D, ¶ 5].
[7] [Doc. No. 64, § D, ¶ 6].

Billie Lou maintained the household and took care of Travis during their marriage.  Pam testified that Travis was generous towards Billie Lou during their marriage and that he had bought her several cars.[8] Billie Lou specifically recalled five vehicles that Travis titled in her name during their marriage. Billie Lou also recalled multiple times where Travis gifted her large sums of money. Matt and Pam both testified that, while Travis was generous, he often used his money to get what he wanted from people and to make "deals."[9]

Towards of the end of 2019 and the beginning of 2020, Billie Lou began preparing to leave Travis with the help of Pam and Matt. In August 2019, Billie Lou created White Oklahoma, LLC to purchase a home without Travis's knowledge. In February 2020, Billie Lou left a letter for Travis describing the emotional turmoil she experienced during the marriage, and she moved out of their marital home.[10] The letter informed Travis that he no longer wanted him to contact her.[11] Billie Lou also sent Pam a letter about the separation.[12] Billie Lou testified she wrote this letter to protect Pam. On February 20, 2020, Billie Lou filed a divorce petition that sought the enforcement of Billie Lou's and Travis's matrimonial agreement.[13] At some point after Billie Lou filed for divorce, Travis sent her a letter in which he stated that he wanted to make amends.[14] Billie Lou did not respond.

On May 14, 2020, Billie Lou testified that Pam facilitated a meeting between Travis and Billie Lou. Three days later, on May 17, 2020, Billie Lou and Travis entered into a property settlement agreement.[15] This settlement agreement provided that Travis would pay Billie Lou

---

[8] [Doc. No. 98-17, Pam Clark Depo, p. 30, 13-21].
[9] [Doc. No. 98-17, Pam Clark Depo, p. 118, 1-8].
[10] [Doc. No. 99-24].
[11] [Doc. No. 99-24, p. 5].
[12] [Doc. No. 99-26].
[13] [Doc. No. 99-23].
[14] [Doc. No. 99-17].
[15] [Doc. No. 100-1, p. 1].

$650,000.00 in exchange for her interest in the Louisiana and Florida properties.[16] Billie Lou testified that she texted Travis for about a week after this meeting, but she blocked his number after he had an emotional outburst.

On June 9, 2020, Billie Lou's counsel sent Travis's counsel a letter stating Travis breached their settlement agreement.[17]  She filed a Motion to Enforce Settlement Agreement on June 10, 2020.[18] On June 18, 2020, Billie Lou testified that Pam facilitated another meeting between Billie Lou and Travis, and Billie Lou met with him at the former marital home.

On July 29, 2020, Travis and Billie Lou entered into a Voluntary Partition of Co-Owned Property and Settlement of Claims of Separate Estates.[19] In this agreement, Billie Lou accepted $650,000.00 as an equalizing payment and granted Travis her interests in various properties.[20] Billie Lou received the payment that day.[21] Billie Lou testified that after they signed this agreement, she showed Travis her new home. From that point forward, Billie Lou and Travis began to speak more frequently. By August 2020, Billie Lou occasionally stayed overnight with Travis at the former marital home.[22]

### B.  The Purchase and Presentation of the 2018 Rolls Royce Phantom

In September 2020, Matt learned a 2018 Rolls Royce Phantom ("the Rolls Royce" or "the car") was available for purchase. Matt informed Travis about the car. At that time, Travis also owned a 2019 Rolls Royce Phantom ("Travis's Rolls Royce").[23] Travis expressed interest in the car and asked Matt to try to get it.

---

[16] [Doc. No. 100-4, p. 3].
[17] [Doc. No. 100-1].
[18] [Doc. No. 100-4].
[19] [Doc. No. 99-27].
[20] [Doc. No. 99-27, p. 2-4].
[21] [Doc. No. 100-2].
[22] [Doc. No. 64, § D, ¶ 7].
[23] [Doc. No. 64, § D, ¶ 10].

Miranda testified that Travis called Home Federal Bank before he purchased the Rolls Royce. Miranda, an employee at the bank, answered the phone, and Travis asked how much money he had in his account because he wanted to buy the Rolls Royce. He informed her that he wanted to keep one Rolls Royce in Shreveport and the other in Florida. He did not mention potentially gifting the car to Billie Lou.

On or about September 20, 2020, Travis purchased the Rolls Royce for $315,000.00.[24] Matt testified that Travis informed Matt and Jeff that he wanted to use the Rolls Royce as leverage to get Billie Lou to live with him until he died. Matt testified that Travis made a similar statement on another occasion. Travis paid Matt a $50,000.00 finder's fee for the Rolls Royce. Travis purchased the Rolls Royce under an "open" title that did not designate the purchaser or owner.[25] Both Billie Lou and Travis were named on the insurance policy for the Rolls Royce.[26] The insurance policy came into effect on September 25, 2020.[27]

On September 24, 2020, Billie Lou visited Pam at her home, which was adjacent to the Travis's home.[28] Both Pam and Matt were present when Travis presented the Rolls Royce to Billie Lou.[29] Pam took photographs and a video of the presentation.[30] The first photo shows Travis and Billie Lou standing and talking.[31] In the next two photos, Travis points to the Rolls Royce, and Billie Lou looks surprised.[32] Other photos show Billie Lou with her head in her hands, and Travis touching her back.[33] Two photos show Billie Lou hugging Travis.[34] The final

---

[24] [Doc. No. 64, § D, ¶ 8]; [Doc. No. 98-1].
[25] [Doc. No. 64, § D, ¶ 18].
[26] [Doc. No. 64, § D, ¶ 17].
[27] [Doc. No. 98-3].
[28] [Doc. No. 64, § D, ¶ 9].
[29] [Doc. No. 64, § D, ¶ 11].
[30] [Doc. No. 64, § D, ¶ 11].
[31] [Doc. No. 99-2, p. 1].
[32] [Doc. No. 99-2, p. 2-3].
[33] [Doc. No. 99-2, p. 4-6].
[34] [Doc. No. 99-2, p. 7-8].

photo shows Travis and Billie Lou standing next to the Rolls Royce.[35] Kay testified that the video, which has since been lost, showed Billie Lou hugging Travis and Travis gesturing to the Rolls Royce.

The following subsections break down each of the witnesses' testimony regarding this presentation.

### i.     Pam's Testimony

Pam testified that she learned Travis had a surprise for Billie Lou approximately two hours before Billie Lou came over to her house.[36] Matt and Jeff brought the Rolls Royce to Travis's house.[37] When the Rolls Royce arrived, Pam and Billie Lou walked over to the house.[38]

When asked to describe what she witnessed, Pam stated that "[i]t was either [a gesture of] love or a bribe. … With Dad, you never knew."[39] She remembered Travis pointed to the car and Billie Lou started crying.[40] She could not remember what Travis said.[41] However, she assumed at that time that the car was Billie Lou's.[42] She testified that Travis wanted Billie Lou to come back.[43] She could not remember if Billie Lou received keys to the Rolls Royce.[44] She also did not remember if Billie Lou drove the Rolls Royce that night.[45]

### ii.    Matt's Testimony

Matt testified that Travis called him earlier that day because he wanted to show Billie Lou the Rolls Royce. Travis asked Matt to move the Rolls Royce to a place where Billie Lou

---

[35] [Doc. No. 99-2, p. 9].
[36] [Doc. No. 98-17, Pam Clark Depo, p. 54, 17-19].
[37] [Doc. No. 98-17, Pam Clark Depo, p. 57, 6-8].
[38] [Doc. No. 98-17, Pam Clark Depo, p. 57, 13-18].
[39] [Doc. No. 98-17, Pam Clark Depo, p. 59, 10-15].
[40] [Doc. No. 98-17, Pam Clark Depo, p. 61, 23-25].
[41] [Doc. No. 98-17, Pam Clark Depo, p. 61, 23-25].
[42] [Doc. No. 98-17, Pam Clark Depo, p. 99, 1-12].
[43] [Doc. No. 98-17, Pam Clark Depo, p. 59, 17].
[44] [Doc. No. 98-17, Pam Clark Depo, p. 63, 23-25].
[45] [Doc. No. 98-17, Pam Clark Depo, p. 64, 1-6].

could see it. Matt parked it in the garage. Pam and Billie Lou arrived at Travis's house at the same time.

He could not remember anything Travis said to Billie Lou when he presented the Rolls Royce. He also stated that he could not hear what Travis said. However, he remembered Billie Lou telling Travis she loved him but could not live with him. He testified that Travis was excited to show off the Rolls Royce. He remembered Billie Lou started crying and hugged both Travis and him. When Matt left, Billie Lou, Travis, and Pam were still in the garage. He did not recall either Pam or Billie Lou getting into the Rolls Royce.

### iii.  *Billie Lou's Testimony*

Billie Lou testified that when she arrived at Pam's house, Pam was excited. Billie Lou talked to Matt, and Matt introduced her to a man she had not met before. Matt and the man then left. Pam kept walking to a window in her garage that looked towards Travis's home and made remarks about a "deal" and "wheeling and dealing." Pam walked over to Travis's house first, and Billie Lou followed her shortly thereafter.

Travis greeted Billie Lou in the breezeway, led her to the garage, and pointed to the Rolls Royce. Billie Lou concluded Travis was gifting her the Rolls Royce in part because he had previously promised to do so earlier in their marriage. She started crying and hugged him, and Travis placed his hand on her arm and consoled her. She believed the Rolls Royce showed he was trying to amend for his past behavior. She hugged Matt after being told he found the Rolls Royce. Billie Lou then sat in the driver's seat of the Rolls Royce, and Pam sat in the passenger's seat. Billie Lou did not start the Rolls Royce because she did not have the keys. When she got out of the Rolls Royce, Pam and Matt had left.

Billie Lou and Travis walked into the home and sat together on the recliner. Billie Lou was still crying at this time. She told Travis she loved him but could not live with him. Billie Lou moved to the couch where she eventually fell asleep. When she woke up a few hours later, Travis asked her to stay the night because he gave her the Rolls Royce, but she decided to leave. She felt like he was trying to manipulate her into spending the night. She saw him watching her in the breezeway as she drove off in her truck. That night she did not take the Rolls Royce to her home, nor did she receive the keys.

### C.  The Days Following the Presentation: September 25, 2020 – October 2, 2020

The following subsections describe each witnesses' alleged interactions with Travis and Billie Lou in the days following the presentation.

#### i.      *Billie Lou's Testimony*

On September 25, 2020, Travis sent Billie Lou several texts:

> When u wake up please tell me what happened last nite I don't
> have the foggiest I was half asleep. I apologize for any bad
> behavior.
> The only thing I remember is when u left. Lou that is the truth.[46]

Billie Lou believed Travis was apologizing for his attempt to manipulate her. Billie Lou texted Travis:

> Thank you for the gift. You saw how it affected me. Thank you
> does not do it justice.[47]

She then offered to sell the Rolls Royce if he ever needed money.[48] That evening Billie Lou returned to Travis's house to look at the Rolls Royce. She testified that Travis gave her both sets of keys for the Rolls Royce. She then drove the Rolls Royce to a restaurant with Travis. When

---

[46] [Doc. No. 99-1, p. 38].
[47] [Doc. No. 99-1, p. 38].
[48] [Doc. No. 99-1, p. 38].

they returned to the former marital home, she left the Rolls Royce there and drove her truck back to her home.

On September 26, 2020, Billie Lou took her truck to Travis's house. She drove the Rolls Royce with Travis back to her house. She parked the Rolls Royce in her driveway because the carport was not large enough to fit the Rolls Royce. She took photos of the Rolls Royce in her driveway.[49] She talked with Travis about building a garage cover for the Rolls Royce but asked to park the Rolls Royce in his garage in the meantime. The marital home has three garages and nine spaces for large vehicles.[50] When the game was over, she took Travis home and parked the Rolls Royce in his garage. She retained both sets of keys at this time.

On September 27, 2020, Billie Lou texted Travis:

> Morning! Rested good. … You left small bottle of pain pills. They are safe. I know you have another bottle. I'll brung them out to you tomorrow when I come to detail my Rolls.[51]

Later that day, she sent a similar text about going to his house the next day to detail the Rolls Royce.[52]

On September 28, 2020, Billie Lou visited Pam. Travis texted her:

> Are you coming home
>
> Please![53]

Luke was at Travis's home to help Travis title the Rolls Royce. Billie Lou testified that she believed Travis was trying to manipulate her because he knew she did not want to talk with his family members. Billie Lou responded:

> Nope. I'll wait. No problem. Not my home.[54]

---

[49] [Doc. No. 99-3, p. 1].
[50] [Doc. No. 64, § D, ¶ 14].
[51] [Doc. No. 99-1, p. 39].
[52] [Doc. No. 99-1, p. 39].
[53] [Doc. No. 99-1, p. 41].

Travis then said:

> I'm trying to wheel and deal and you are one of the wheels![55]

Billie Lou testified that Travis was "wheeling and dealing" about registering the Rolls Royce.

Billie Lou responded:

> No, you don't need me.
> I'm out of business. Not mine.
> If you want to give Luke Rolls, give it to him.[56]

Billie Lou testified her messages were a knee-jerk reaction because she knew Travis promised Luke a Rolls Royce in the past. When Luke left, she went over to Travis's house with Pam to detail the Rolls Royce and Travis's Rolls Royce. Neither Travis nor Billie Lou talked about what happened.

On September 29, 2020, Billie Lou visited Travis. She gave him one set of car keys because her upcoming surgery would prevent her from driving for a few weeks. She testified that she wanted him to be able to move the Rolls Royce if needed.

On September 30, 2020, Billie Lou texted Travis about her surgery the next day.[57] She then texted:

> I told Pam if she wanted to keep my Rolls at her house while Linda there, it would be fine with me. Like sharing the joy you gave me![58]

She visited Pam and told Pam she could drive the Rolls Royce with Linda.

On October 1, 2020, Billie Lou had foot surgery.[59] Travis and Billie Lou exchanged texts about the surgery and her recovery.[60] Billie Lou stopped texting Travis after he sent her an explicit text.[61]

---

[54] [Doc. No. 99-1, p. 41].
[55] [Doc. No. 99-1, p. 41].
[56] [Doc. No. 99-1, p. 42].
[57] [Doc. No. 99-1, p. 42].
[58] [Doc. No. 99-1, p. 42].

On October 2, 2020, Travis sent Billie Lou a text to check in on her.[62] He then texted her:

> Let.               Halbtooke thedevil on them and battle thief ass
> You are a warrior and will over come
> I'm behind you and your edevil and they need to get out of the way
> cause we are coming through
> I love you and they can't stop us full steam ahead
> I have my shoulder against the wheel and they just need to get out
> of the way cause we
> Are gonna bust through.[63]

Billie Lou interpreted these messages to mean that Travis's family could not stop them from getting back together.

Billie Lou testified that Travis never told her the Rolls Royce was not hers. She believed the Rolls Royce was a gift without any conditions attached to it. She further stated she would not have accepted any conditions because she separated from him to avoid manipulation.

### ii.  Matt's Testimony

Matt testified that he checked on Travis daily, but they did not discuss the Rolls Royce again. Matt did not see the Rolls Royce anywhere other than inside Travis's garage.

### iii.  Maria's Testimony

Maria testified that she visited Travis on September 27, 2020, and Travis told her he was letting Billie Lou use the Rolls Royce. She texted Luke:

> [Travis] also said not to say anything to him about it if I saw Billie
> Lou driving [the Rolls Royce] because he was going to let her use
> it.[64]

She then attempted to drive the Rolls Royce. Travis told her where he kept the keys, but when she went to retrieve them, the keys were not there. She asked Travis about it, and Travis

---

[59] [Doc. No. 64, § D, ¶ 15].
[60] [Doc. No. 99-1, p. 42-46].
[61] [Doc. No. 99-1, p. 42-46].
[62] [Doc. No. 99-1, p. 46].
[63] [Doc. No. 99-1, p. 46].
[64] [Doc. No. 98-4, p. 2].

told her that he let Billie Lou drive the Rolls Royce for the weekend and that she was going to clean it for him and bring it back. She texted Luke:

> I asked to take the new car for a spin and he doesn't even have the keys to it!! BL [Billie Lou] has them.[65]

On September 29, 2020, Maria e-mailed Luke an "updated Schedule C to reflect Billie Lou's(Travis') new Rolls also."[66] Maria testified she was adding the new Rolls Royce to Travis's balance sheet.

### iv.  Pam's Testimony

Pam testified that she visited Travis with Billie Lou.[67] Pam wanted to drive the car.[68] She could not find the keys, and she told Travis the keys were not there.[69] Billie Lou then told Pam that she had the keys.[70] Pam testified that Travis said, "Goddammit, Billie Lou, it's not your fucking car."[71] Billie Lou then threw the keys.[72] Pam testified that this conversation made her believe the car was not Billie Lou's.[73]

### v.  Luke's Testimony

Luke testified that Travis asked him for help with titling the Rolls Royce. Travis told Luke he bought the Rolls Royce to give to Billie Lou so that she would come back and take care of him. Luke asked Travis if he wanted to title the Rolls Royce in Billie Lou's name, and Travis said no.

Luke testified that he also overheard a phone call between Travis and Billie Lou about the car. Luke was visiting Travis with Maria, and Travis told them that Billie Lou was on her

---

[65] [Doc. No. 98-4, p. 3].
[66] [Doc. No. 99-19, p. 1].
[67] [Doc. No. 98-17, Pam Clark Depo, p. 89, 2-3].
[68] [Doc. No. 98-17, Pam Clark Depo, p. 89, 2-6].
[69] [Doc. No. 98-17, Pam Clark Depo, p. 89, 2-6].
[70] [Doc. No. 98-17, Pam Clark Depo, p. 89, 7-8].
[71] [Doc. No. 98-17, Pam Clark Depo, p. 89, 9-10].
[72] [Doc. No. 98-17, Pam Clark Depo, p. 82, 11-14].
[73] [Doc. No. 98-17, Pam Clark Depo, p. 82, 18-20].

way to watch football. While Travis was on the phone with Billie Lou, he told Billie Lou that it was not her car yet.

### vi. Doug Roger's Testimony

Doug Rogers is an insurance agent and friend of Travis. He testified that he completed insurance work for Travis and other members of the Miller family.

On September 25, 2020, Travis called Doug to help him insure the Rolls Royce. Doug went to Travis's house that day. Doug testified that Travis referred to the car as his Rolls Royce, and he did not mention that he had given it to Billie Lou the day before. Travis did not say anything about the presentation. He did not tell Doug anything that led Doug to believe the Rolls Royce was not Travis's. Doug and Travis called an insurance broker in Florida to get coverage on the car.[74] He testified that Travis told the insurance broker he bought the Rolls Royce to get his wife to come back to him.

On September 28, 2020, Doug e-mailed Luke about this meeting with Travis.[75] Doug stated, "[Travis] mentioned he bought this other Rolls to give to Billie Lou so that she may not divorce him after all. That is FYI, counselor."[76]

### D.  After Travis's Death

Travis died on October 2, 2020.[77] Billie Lou left the hospital to go to Travis's home to get his dog. The home was unlocked at that time.

Kay changed the locks to the former marital home later that day.[78] The Rolls Royce was still inside the garage at that time.[79] Personal items belonging to Billie Lou were also still inside

---

[74] [Doc. No. 98-2, p. 1].
[75] [Doc. No. 98-5, p. 1].
[76] [Doc. No. 98-5, p. 1].
[77] [Doc. No. 64, § D, ¶ 16].
[78] [Doc. No. 64, § D, ¶ 21].
[79] [Doc. No. 64, § D, ¶ 22].

the house.[80] Billie Lou testified that Pam informed her that the locks had been changed. Billie

Lou did not think it was uncommon for executors to lock up the house to protect the decedent's

belongings.  She told Pam she would see about coming to help plan the funeral the next day.

Billie Lou texted Kay to tell her she knew the safe combination if Kay needed it.[81] Billie

Lou then stated she would like to start planning Travis's funeral.[82] Kay responded with two texts:

> Sorry, the plans have already started. You can let Pam explain. The
> house is locked up.
> I needed to make sure no one was going to get in unauthorized.[83]

Billie Lou sent two texts in reply:

> Please don't shut me out! I am still his wife, a widow not divorce. I
> was there for your father when he needed me. I'm not out for your
> money.
>  If y'all want to do it all yalls way and not what Travis wanted,
> then y'all have at it.[84]

Kay responded:

> Billie Lou, I am grieving and dont have time to talk to you. We
> will let you know of the plans later today. You left him … That
> speaks volumes to me. I'm sorry but you made a conscience
> choice.[85]

Billie Lou then texted:

> You all never understand our feelings for each other.[86]

Kay did not permit Billie Lou to plan any of the funeral or to write any part of the obituary.

Billie Lou published her own tribute for Travis.

On October 3, 2020, Pam texted Kay to ask if Kay had found the keys to the Rolls

Royce.[87] Kay replied:

---

[80] [Doc. No. 64, § D, ¶ 22].
[81] [Doc. No. 98-16, p. 1].
[82] [Doc. No. 98-16, p. 2].
[83] [Doc. No. 98-16, p. 2-3].
[84] [Doc. No. 98-16, p. 4-5].
[85] [Doc. No. 98-16, p. 5-6].
[86] [Doc. No. 98-16, p. 6].

13

Nope. There is only 1 RR key.[88]

Pam then called Billie Lou a "thief," and Kay stated they would "deal with her soon enough."[89]

Pam testified that a few days after Travis died, Billie Lou sent her an inappropriate text and their friendship subsequently ended.[90] Pam did not respond to the text message.[91] She testified that Billie Lou sent her an apology letter.[92] Pam started texting Billie Lou again after that.[93] However, their friendship eventually came to an end once more.[94]

On October 8, 2020, Doug e-mailed Luke and Kay about changing Travis's insurance policies to name the estate.[95] Because the title for the Rolls Royce was open, Luke stated they would need to discuss titling the Rolls Royce in the name of the estate.[96] Luke then said, "Technically, Billie Lou was Travis' wife at the time of his death. However, I would encourage that all vehicles will be locked in the garage and no person be allowed to drive them."[97] He also referred to an earlier property agreement between Travis and Billie Lou, saying "there was a property settlement in the divorce proceedings. Accordingly, she has no right to drive any of the vehicles. … Having said that, I would think it is safe to remove her name as an insured driver."[98] Doug stated that he would advise the insurer of Travis's death.[99]

---

[87] [Doc. No. 98-7, p. 1].
[88] [Doc. No. 98-7, p. 1].
[89] [Doc. No. 98-7, p. 1].
[90] [Doc. No. 98-17, Pam Clark Depo, p. 19, 10-25, p. 20, 1-21].
[91] [Doc. No. 98-17, Pam Clark Depo, p. 21, 18-19].
[92] [Doc. No. 98-17, Pam Clark Depo, p. 21, 23-25].
[93] [Doc. No. 98-17, Pam Clark Depo, p. 22, 4-6].
[94] [Doc. No. 98-17, Pam Clark Depo, p. 22, 7-8].
[95] [Doc. No. 99-4, p. 2-3].
[96] [Doc. No. 99-4, p. 1].
[97] [Doc. No. 99-4, p. 2].
[98] [Doc. No. 99-4, p. 2].
[99] [Doc. No. 99-4, p. 1].

On October 9, 2020, Billie Lou texted Kay, saying "Travis trusted that you would do what he wanted, and always believed you would be fair and do the right thing. He believed in you."[100] Kay did not respond.[101]

On October 12, 2020, Kay filed a *Petition for Order of Effect of Probate of Notarial Testament and for Confirmation of Independent Executrix* to name herself as executrix and to open Travis's succession proceeding.[102]

On October 29, 2020, Billie Lou texted Luke:

> I know I told you if possible, I wanted Pam and Matt to have the Rolls Pop [Travis] gave me. I have change my mind. If possible at all, I want it, it's the last think Pop gave me besides his love. Just wanted to go on record with you. Haven't mentioned to anyone else.[103]

Luke told Billie Lou he would let Kay know.[104]

Around November 3, 2020, Billie Lou called Doug Rogers.[105] Billie Lou testified that she could not remember what she said in this conversation. She stated that she called him to see if the Rolls Royce was insured. Doug sent an e-mail to Kay and Luke about this call.[106] He stated:

> I received an odd call from Billie Lou this morning. She told me Travis had called her and told her he had put the second Rolls in her name … and that she would like to have a copy of the policy. She further stated that one day when she was over at Travis' home, both Pam and Matt were there and were "witnesses" when Travis told her he was giving her the second Rolls to her as "thanks for being there with him through his illness." … I told her that I do not know why Travis would have said that to her, but … that I saw the title, and it was not in her name, and that he did not mention anything about it being her car. … She mentioned he was "in and out of it" a lot then and make have gotten his story mixed up. Between us, what Travis did say to the State Farm customer

---

[100] [Doc. No. 98-16, p. 7].
[101] [Doc. No. 98-16, p. 7].
[102] [Doc. No. 64, § D, ¶ 19]; [Doc. No. 98-8].
[103] [Doc. No. 98-9, p. 2].
[104] [Doc. No. 98-9, p. 2].
[105] [Doc. No. 98-10, p. 1].
[106] [Doc. No. 98-10, p. 1].

service representative was that he brought a second Rolls because he was going to offer it to his wife if she would not divorce him. But he did not say it in a way that made me think he had already had that spoken to her about that. … Travis never said to me that he had given the car to Billie Lou, and he never mentioned wanting to have an insurance policy in her name out of appreciation or because it was her car. … She told me she was going to be patient for now because she knew the probate would take a long time, and she knew the car was locked up in Travis' garage. But it is clear to me that she thinks Matt and Pam will back her up on Travis saying the car was Billie Lou's, and she intends to hang in there to try to get it.[107]

On November 4, 2020, Kay messaged Pam to ask if Pam knew why Billie Lou was claiming the Rolls Royce was hers and that Pam and Matt would back up her claim.[108] Pam responded:

No, I do not! I haven't heard from her. And Matt and his friend will attest that it was a bargaining chip! He told them both if she came back it was hers! His name is Jeff Goodpaster. He's the one who knew the previous owners.[109]

Kay expressed that she did not believe Billie Lou's claim was valid.[110] Kay also texted Pam:

If I don't hear from deryl th Friday, we will talk about plan for securing home in florida[111]

Later that day, Pam texted Kay:

Min, been thinking about BillieLou blowing up your phone…if it was indeed her car, which it clearly wasn't…why didn't she insure it? And I was also present when Dad got on her ass because she took at one point both sets of keys…he told her "it's not your fucking car yet" bring back the keys…which she brought back only one set…so she still has the other.[112]

Pam stated she was present when Travis insured the Rolls Royce.[113] Kay responded:

---

[107] [Doc. No. 98-10, p. 1].
[108] [Doc. No. 98-7, p. 2].
[109] [Doc. No. 98-7, p. 2].
[110] [Doc. No. 98-7, p. 2].
[111] [Doc. No. 98-7, p. 3].
[112] [Doc. No. 98-7, p. 3].
[113] [Doc. No. 98-7, p. 3].

Yeah, she didn't call me she has been calling insurance agent wanting a copy of the policy dad bought for the car and she said put it in her name. He asked me if I was aware that she claimed that yall had heard dad tell her he was doing that.[114]

Pam replied:

Dads other rolls is insured with the same company. They did ask who the primary driver would be and he said BillieLou because the rate was less expensive because of Dads age[115]

Kay then stated:

Well, doug didnt say that. He said dad was the one who had bought the policy.i'm not really worried. Just wish she would leave it alone.[116]

Pam replied:

Okay. He never said to the agent it was her car only who the primary driver would be for the lower rate[117]

On November 8, 2020, Billie Lou texted Kay:

I would really like for you to consider visiting with me in person. I have no argument, and no type of judgment or ugly things to say. But I really would like to visit you at your place or mine. Your Dad was proud of my choice of a home. He felt he taught me well. If you are good.[118]

Kay responded on November 9, 2020:

I'm not ready to meet you yet. Did you have something specific in mind that you want to tell me? I'm not one for suspense. Kay.[119]

Billie Lou replied:

Nothing specific. No suspense. Just thought we both might need some closure.[120]

---

[114] [Doc. No. 98-7, p. 4].
[115] [Doc. No. 98-7, p. 4].
[116] [Doc. No. 98-7, p. 4].
[117] [Doc. No. 98-7, p. 4].
[118] [Doc. No. 98-16, p. 9-10].
[119] [Doc. No. 98-16, p. 11-12].
[120] [Doc. No. 98-16, p. 12].

On November 11, 2020, Kay, Doug, and Luke discussed registering the Rolls Royce.[121]

In November 2020, sometime around Thanksgiving, Billie Lou testified that Pam and Matt showed up at the house in Sanibel where she was staying. They had a truck and flatbed trailer. Matt told her she needed to leave, and she refused. Deryl Medlin ("Medlin"), the attorney for the succession, had previously advised Billie Lou that she may want to get a lawyer in Florida to address the Sanibel house. After this point, Billie Lou testified that she began to worry she could not depend on Matt and Pam to back up her claim of ownership.

After Travis's death, Kay talked with numerous individuals about the Rolls Royce, and these individuals informed her Travis bought the Rolls Royce to use as a "carrot" to get Billie Lou to move back in with him. Kay was aware of the text messages between Travis and Billie Lou regarding the Rolls Royce. Ultimately, Kay determined the Rolls Royce was not Billie Lou's. She did not inform Billie Lou that she believed Travis did not freely gift her the Rolls Royce.

Travis's Will designated Billie Lou, Kay, and Miranda "to serve as a committee to distribute by majority vote my personal effects after my death, … particularly my … toys (automobiles and motorcycles).[122] However, Billie Lou testified that Medlin informed her that Kay and Miranda would make these decisions without her. He suggested she write a letter to Miranda and Kay regarding the property she wanted from Travis's estate. On December 21, 2020, Billie Lou sent a letter to Medlin, Kay, and Miranda detailing the "articles [she] would love to have. It of course is up to you Kay [and] Miranda."[123] She wrote the following paragraph regarding the Rolls Royce:

---

[121] [Doc. No. 98-10, p. 3-6].
[122] [Doc. No. 98-8, p. 8].
[123] [Doc. No. 98-11, p. 1]; [Doc. No. 98-12].

18

The other thing I want is not a part of the will. It is the last gift he gave me. The Rolls Royce. He surprised me a week before he died ... I was very touched. I didn't need a Rolls, but he thought his woman should drive a Rolls, same as him. There are also two witnesses that were there when he gave it to me, Pam [and] Matt. Don't know if they will be honest about it. But I forgot if Pam or Travis told me, that Travis gave Matt a $50,000.00 finders fee. Matt brought the deal to his attention. And you know how Travis likes a deal. Luke was consulting with Travis a few days before he died about registering in Montana, I think, so he wouldn't have to pay taxes for registration., I feel sure the title was not filled out before he died. Talked to Doug Rogers, he said Travis insured it under his million dollar umbrella policy, and the paper work of ownership had not been filled out. It is the last thing Travis gave me. I have sentimental feeling for it. I was overwhelmed and even texted him that I was concerned about him spending money he may need, [and] told him I would sell it and give him proceeds if he ever needed it. I would like to enjoy it a while, then my intention is to donate to be auctioned off at Christmas in the sky in his honor.[124]

She also wrote that she "left a number of things that were mine. Please give to whoever wants them."[125] She ended the letter by saying, "I will not believe anything Pam has said about you Kay, as long as you don't believe anything she has to say about me. Thought she was a true friend."[126] Billie Lou testified that she did not, at this time, believe Kay or Miranda would act adversely to her interest in the Rolls Royce. Neither Medlin, Kay, nor Miranda responded to this letter.[127] When Kay received the letter, she had not yet made the decision to sell the car.

From the time of Travis's death and through the beginning of 2021, Maria, Miranda, Pam, Luke, and Kay were aware of Billie Lou's claim of ownership and were discussing her statements.[128] The family members did not disclose these conversations with Billie Lou.[129] Miranda and Kay eventually met to discuss what to do with the Rolls Royce and Travis's Roll

---

[124] [Doc. No. 98-11, p. 4-5].
[125] [Doc. No. 98-11, p. 2].
[126] [Doc. No. 98-11, p. 6].
[127] [Doc. No. 64, § D, ¶ 23].
[128] [Doc. No. 64, § D, ¶ 25].
[129] [Doc. No. 64, § D, ¶ 25].

Royce. At this meeting, they decided to sell both automobiles. At some point after Travis's death, Kay titled the Rolls Royce in the name of the succession. [130]

Towards the end of January 2021, Kay had keys made for the Rolls Royce because she needed two keys to sell it.[131] On January 26, 2021, Kay texted Matt that she wanted to sell both the Rolls Royce and Travis's Rolls Royce for $600,000.00.[132] On January 29, 2021, Kay texted several family members that she would not call Billie Lou "under any condition."[133] On February 5, 2021, Kay sold the Rolls Royce to Herbert's Town and Country for $300,000.00.[134] She also sold Herbert's Town and Country Travis's Rolls Royce for $300,000.00.[135] Kay deposited the funds into the succession's bank account.[136] Pam received $500,000.00 from the succession even though she was not named in Travis's will.[137] She testified that he had promised to give her that $500,000.00 before he died.[138]

In the last week of February 2021, Billie Lou sought possession of the car through her lawyer.[139] On February 25, 2021, Billie Lou learned the Rolls Royce had been sold.[140] Billie Lou testified that she had believed Kay would honor her ownership claim until she learned of the sale. On March 4, 2021, Billie Lou's counsel formally demanded that Kay recover the Rolls Royce and return it to Billie Lou.[141] Billie Lou's counsel sent follow-up letters to Medlin after they did not receive a response.[142] On March 23, 2021, Medlin informed Billie Lou's counsel

---

[130] [Doc. No. 64, § D, ¶ 28].
[131] [Doc. No. 99-8].
[132] [Doc. No. 99-6, p. 2].
[133] [Doc. No. 99-7, p. 1].
[134] [Doc. No. 98-13].
[135] [Doc. No. 98-14].
[136] [Doc. No. 98-15].
[137] [Doc. No. 98-17, Pam Clark Depo, p. 31, 19-25, p. 32, 1-7].
[138] [Doc. No. 98-17, Pam Clark Depo, p. 33, 2-18].
[139] [Doc. No. 64, § D, ¶ 23].
[140] [Doc. No. 64, § D, ¶ 24].
[141] [Doc. No. 64, § D, ¶ 30]; [Doc. No. 99-9].
[142] [Doc. No. 64, § D, ¶ 31]; [Doc. No. 99-10].

that that the Rolls Royce was "unretrievable."[143] On June 30, 2021, Billie Lou's counsel sent Medlin a letter detailing the evidence they had to support Billie Lou's ownership claim.[144]

On July 1, 2021, Kay texted Doug Rogers saying that she needed "help" and asking for a statement about what Travis said to him regarding ownership of the Rolls Royce.[145] On July 2, 2021, Doug sent Kay a letter recounting what he discussed with Travis while talking with the insurance agent.[146] On July 7, 2021, Kay e-mailed Luke and Maria for correspondence relating to Travis around the time of the alleged donation.[147] Luke told Kay he would look for his old phone and that he remembered "the conversation [he] had with [Travis] and the one [Travis] had with her on September 28."[148]

Billie Lou, Kay, and the estate discussed the Rolls Royce and other personal items in an ancillary succession proceeding in Florida.[149] This succession proceeding involved the Sanibel home.[150] During these discussions, Billie Lou successfully retrieved personal items she had left in the former marital home.[151] This retrieval supported Billie Lou's conclusion that Kay changed the locks to secure the home and not to dispute Billie Lou's claim of ownership over those items.[152] Between the end of 2021 and the beginning of 2022, Billie Lou and the Estate resolved the ancillary succession proceeding involving the Sanibel home.[153] However, the parties did not resolve the Rolls Royce issue.[154] Billie Lou filed her *Summary Proceeding for Declaratory*

---

[143] [Doc. No. 64, § D, ¶ 32].
[144] [Doc. No. 99-11].
[145] [Doc. No. 99-12, p. 3].
[146] [Doc. No. 99-13].
[147] [Doc. No. 99-14, p. 2].
[148] [Doc. No. 99-14, p. 1].
[149] [Doc. No. 64, § D, ¶ 33].
[150] [Doc. No. 64, § D, ¶ 33].
[151] [Doc. No. 64, § D, ¶ 34].
[152] [Doc. No. 64, § D, ¶ 34].
[153] [Doc. No. 64, § D, ¶ 35].
[154] [Doc. No. 64, § D, ¶ 35].

*Judgment and for Damages* in state court in the succession proceeding on February 1, 2022.[155] Kay removed the action to this Court.[156] On February 21, 2023, Kay e-mailed Luke to ask if he knew whether Pam and Matt were going to "agree with [her] side of the lawsuit."[157]

Billie Lou testified that she had no possession of the Rolls Royce during this time. She saw it one time when she looked in the window of the garage. She did not drive the Rolls Royce after Travis died. Billie Lou testified that, at this time, she did not have a need for the Rolls Royce because she was recovering from surgery and could not drive. Additionally, she still did not have a place to store the vehicle. At no point after September 24, 2020, did Billie Lou attempt to build a garage or place to store the Rolls Royce. Billie Lou testified that she still has a set of keys to the Rolls Royce.

## II.   CONCLUSIONS OF LAW

This case was brought pursuant to Title 28 U.S.C. § 1332 diversity jurisdiction. Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction applies the substantive law of the forum state.

### A.  Prescription

Conversion is an "act in derogation of the plaintiff's possessory rights and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite term." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760 (La. 1985). What the defendant later did with the converted property or whether the defendant derived a benefit from the conversion is irrelevant to the issue of whether a conversion occurred. *Id*. A defendant commits conversion when either:

---

[155] [Doc. No. 64, § D, ¶ 36].
[156] [Doc. No. 64, § D, ¶ 36].
[157] [Doc. No. 99-16].

22

> (1) possession is acquired in an unauthorized manner; (2) the
> chattel is removed from one place to another with the intent to
> exercise control over it; (3) possession of the chattel is transferred
> without authority; (4) possession is withheld from the owner or
> possessor; (5) the chattel is altered or destroyed; (6) the chattel is
> used improperly: or (7) ownership is asserted over the chattel.

*Dual Drilling Co. v. Mills Equipment Investments, Inc.*, 721 So.2d 853, 857 (La. 12/1/98).

Conversion is a tort subject to a one-year liberative prescriptive period. La. Civ. Code Art. 3492. "[P]rescription commences to run from the day injury or damage is sustained." *Id*. More specifically, courts have held that prescription begins to run "on the date the aggrieved party has actual or constructive knowledge of the facts that would entitle him to bring suit." *Jefferson v. Crowell*, 956 So.2d 746, 749 (La. App. 2d Cir. 5/9/07). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." *Campo v. Correa*, 828 So.2d 502, 510-11 (La. 6/21/02). However, "a plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice." *Id*. at 511. "The ultimate issue is the *reasonableness* of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Id*.

In general, the defendant bears the burden of proving a claim has prescribed. *Bihm v. Deca Sys., Inc*., 226 So. 3d 466, 480 (La. App. 1 Cir. 8/8/17); *Dixon v. Houck*, 466 So. 2d 57, 59 (La. Ct. App. 1985). If the defendant meets their burden, the burden then "shifts to the plaintiff to prove an interruption or suspension of prescription." *Id*. at 60. The Court ultimately finds that

Kay met her burden of proving prescription and that Billie Lou has not proven that an interruption of prescription applies to her cause of action.

The following is a timeline of important events related to prescription:

| Timeline of Events | |
| --- | --- |
| **October 2, 2020** | Kay Miller changes the locks and informs Billie Lou. Billie Lou texts Kay about funeral plans and is rebuffed. |
| **October 3, 2020** | Kay and Pam text each other about Billie Lou and the keys to the Rolls Royce. |
| **October 8, 2020** | Doug, Kay, and Luke discuss removing Billie Lou from the insurance policy and titling the Rolls Royce in the name of the estate. |
| **October 9, 2020** | Billie Lou texts Kay that Travis trusted her to "be fair and do the right thing." |
| **October 12, 2020** | Kay files petition to name herself as executrix and open the succession. |
| **October 29, 2020** | Billie Lou texts Luke to go "on record" about wanting the Rolls Royce. |
| **November 3, 2020** | Billie Lou calls Doug to get a copy of the insurance policy and mentions she has witnesses to the presentation. |
| **November 4, 2020** | Kay and Pam text about Billie Lou claim of ownership. |

| | |
|---|---|
| **November 8-9, 2020** | Billie Lou asks Kay to meet in person. Kay refuses. |
| **November 11, 2020** | Kay, Doug, and Luke discuss registering the Rolls Royce. |
| **Late November 2020** | Pam and Matt arrive at the Sanibel home and tell Billie Lou she has to leave. Billie Lou begins to worry Matt and Pam will not support her claim of ownership. |
| **December 21, 2020** | Billie Lou sends a letter to Medlin, Kay, and Miranda about wanting the Rolls Royce. |
| **Late January 2021** | Kay has keys made for the Rolls Royce. |
| **January 26, 2021** | Kay texts Matt about selling the Rolls Royce. |
| **January 29, 2021** | Kay texts family members that she does not want to call Billie Lou under any condition. |
| **February 5, 2021** | Kay sells the Rolls Royce to Herbert's Town and Country. |
| **Late February 2021** | Billie Lou seeks possession of the car through her lawyer. |
| **February 25, 2021** | Billie Lou learns the Rolls Royce has been sold. |
| **March 4, 2021** | Billie Lou formally demands the return of the Rolls Royce. |
| **March 23, 2021** | Medlin informs Billie Lou that the Rolls Royce |

| | is "unretrievable." |
| --- | --- |
| **Late 2021-Early 2022** | Billie Lou and Kay involved in discussions in an ancillary succession proceeding. Billie Lou retrieves personal items from Travis's home. |
| **February 1, 2022** | Billie Lou filed suit. |

First, to determine whether Billie Lou had actual or constructive knowledge of conversion, the Court must determine when the alleged conversion took place.[158] On October 2, 2020, Kay changed the locks to the former marital home. The Rolls Royce was inside the garage at this time. Billie Lou testified that she could not access the home. She did not receive access to her personal items until several months later. Because Kay prevented Billie Lou from accessing the garage during this time, she withheld possession from the alleged owner.

Further, it does not appear from the facts before the Court that Kay maintained possession on behalf of Billie Lou. Billie Lou testified that Travis allowed her to store the Rolls Royce at his home. Certainly, if *Travis* had maintained possession in his home, such possession would not constitute conversion. *See Hampton v. Hibernia Nat. Bank,* 598 So. 2d 502, 504 (La. Ct. App. 1992) (stating that "when the owner gives another permission to take possession of his property, he must terminate that permission by requesting return of the property before continued possession by the non-owner will constitute a conversion"). However, Billie Lou never asked Kay for permission to store the Rolls Royce at Travis's home nor did Kay indicate that she would continue to store the Rolls Royce for Billie Lou. In fact, the record demonstrates that as early as October 8, 2020, Kay began taking actions adverse to Billie Lou's alleged ownership interest. On October 8, 2020, Kay, Luke, and Doug discussed changing the insurance policy on

---

[158] For purposes of this analysis, the Court assumes Billie Lou has a valid claim of ownership such that Kay's action would have constituted a conversion.

the Rolls Royce to remove Billie Lou as a driver and titling the Rolls Royce in the name of the estate. Kay clearly was not holding the Rolls Royce for Billie Lou at this time and instead was acting adversely to her alleged ownership interests.

The Court does not find that a conversion only took place upon the sale of the Rolls Royce. A conversion does not require that the defendant sell the vehicle, and Kay's actions prior to this sale would constitute conversion if Billie Lou was the owner of the Rolls Royce. Kay took several actions purporting to exert ownership over the Rolls Royce prior to this date and barred Billie Lou from accessing the garage where the Rolls Royce was present. Therefore, assuming Billie Lou had a valid claim of ownership, a conversion would have taken place at the time Kay first prevented Billie Lou from accessing the Rolls Royce on October 2, 2020. At the very latest, a conversion would have occurred on October 8, 2020, when Kay began to take actions in derogation of Billie Lou's alleged ownership while continuing to withhold possession from Billie Lou.

Now the Court must determine whether Billie Lou had actual or constructive knowledge of this conversion before February 1, 2021 (one year prior to Billie Lou filing suit). The Court does not find that Billie Lou had actual knowledge of conversion before February 1, 2021. While Kay did inform Billie Lou that she changed the locks to Travis's home, she did not inform Billie Lou that she was seizing control of the Rolls Royce, withholding possession of the Rolls Royce specifically, or planning to sell the Rolls Royce. Because Billie Lou could interpret Kay's message about changing the lock in numerous ways, the Court does not find she had actual notice of a conversion.

However, the Court finds substantial evidence of constructive knowledge in the record. Billie Lou lost complete access to the Rolls Royce on October 2, 2020. When she reached out to

Kay, Kay continuously rebuffed or ignored her. After being met with silence from Kay, Billie Lou messaged Luke to go "on record" about wanting the Rolls Royce. Billie Lou also called Doug Rogers in November 2020 for a copy of the insurance policy and allegedly informed him that she had "witnesses" to the presentation and that she would be patient for the probate proceedings to conclude. Additionally, in November 2020, Pam and Matt arrived at the Sanibel home and told Billie Lou she needed to leave. Billie Lou testified that she began to worry she could not depend on Pam and Matt after this visit. She then sent a letter to Kay, Miranda, and Medlin informing them that she wanted the Rolls Royce and telling them about the presentation. While Billie Lou testified, she wrote this letter merely to make Kay aware of her claim of her ownership, the letter, in conjunction with Billie Lou's other communications, suggests Billie Lou wanted to prove her ownership claim and to seek a return of the Rolls Royce to her possession. Specifically, Billie Lou stated that she "want[ed]" the Rolls Royce. Billie Lou's proffered explanation is one interpretation of the letter, but the Court finds the more credible explanation is that Billie Lou understood Kay was likely not going to respect her ownership claim and wanted to prove that such claim was valid to facilitate a return of the Rolls Royce.

The Court finds the record evinces numerous attempts by Billie Lou to prove and support her alleged claim of ownership to family members and family friends following the changing of the locks. Billie Lou testified that she did not believe Kay would act adversely to her alleged ownership interest, but that testimony is substantially weakened by her contacts with others. The Court finds that these are not the actions of an individual who believes the property at issue is firmly within her control and possession.

This conclusion is strengthened by the way Billie Lou addressed the other personal items left in Travis's home after Kay changed the locks. Following the resolution of an ancillary

succession proceeding in Florida, Billie Lou retrieved personal items she left in the home. The parties stipulated that this retrieval supported Billie Lou's conclusion that Kay changed the locks to secure the home and not to dispute Billie Lou's claim of ownership over those items.[159] However, following the lock change, Billie Lou did not send text messages to other family members or family friends to support her claim of ownership over those items. She did distinctly take such steps regarding the Rolls Royce. Further, in the December 21, 2020, letter to Kay, Miranda, and Medlin, Billie Lou referenced the items she left behind and stated Kay and Miranda could distribute the items as they wished. Conversely, in this same letter, she once again sought to establish her ownership claim by alluding to witnesses and the presentation. In sum, Billie Lou's communications with family members and family friends regarding the Rolls Royce strongly suggest she believed Kay would not return the Rolls Royce to her possession following the lock change.

Again, constructive knowledge "is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Campo*, 828 So.2d at 510-11. Billie Lou's actions demonstrate that the changing of the locks and her inability to access the Rolls Royce spurred her into action, and she sent numerous communications to support her claim of ownership. Certainly, it appears that Billie Lou was at least "on guard" that her claim of ownership was threatened, and that Kay was withholding possession from her when she changed the locks. Her actions do not, as Billie Lou has argued before, merely demonstrate a "mere apprehension that something may be wrong." Rather, these actions exhibit that changing the locks compelled Billie Lou to take steps to strengthen and support her claim of ownership in the hopes of regaining possession of the Rolls Royce from Kay and the estate.

---

[159] [Doc. No. 64, § D, ¶ 34].

The Court finds constructive knowledge of a conversion because Billie Lou took actions to establish her claim of ownership after Kay seized possession of the Rolls Royce by changing the locks. A reasonable inquiry would have revealed that Kay was acting adversely to Billie Lou's interests as early as October 2, 2020. While Billie Lou did seek to establish her ownership claim, she did not seek re-possession of the Rolls Royce in any form. She testified she did not seek re-possession because she thought Kay would honor her claim and she had nowhere to store the vehicle. However, as discussed above, Billie Lou's own actions demonstrate she feared Kay would not protect her alleged ownership interest. A reasonable person in Billie Lou's shoes, especially in light of the fraught relationship with and continued silence from the Defendant, would not have simply waited for months before demanding the return of the property or at least an acknowledgment of ownership from the Defendant.

Accordingly, the Court finds that Billie Lou's claims prescribed because she had constructive knowledge of a conversion since at least October 29, 2020, the date of her first communication to Luke about wanting to go "on record." At the very latest, it appears that Billie Lou had constructive notice of a possible conversion on December 21, 2021, when she sent a letter to Kay, Miranda, and Medlin about wanting the Rolls Royce. In sum, the factual record before the Court indicates Billie Lou had constructive notice of the alleged conversion, and Kay has met her burden of proving prescription.

Finally, the Court finds that Billie Lou did not meet her burden of proving an exception to prescription applies. One exception to prescription is *contra non valentum*, a judicially created "limited exception where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues." *Corsey v. State, Through Dep't of Corr*., 375 So. 2d 1319, 1321 (La. 1979). The doctrine applies where "[t]he principles of equity and justice … demand that under

certain circumstances, prescription be suspended because [the] plaintiff was effectually prevented from enforcing his rights for reasons external to his own will." *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994). Courts thus distinguish "between personal disabilities of the plaintiff (which do not prevent prescription from running) and an inability to bring suit for some cause foreign to the person of the plaintiff (which suspends its running)." *Id*. at 212. Courts have applied the doctrine in the following circumstances:

> (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

*Causby v. Perque Floor Covering*, 707 So. 2d 23, 25 (La. 1/21/98).

Only the third and fourth scenarios are relevant here. Courts apply the third category "where [the] defendant engages in conduct which prevents the plaintiff from availing himself of his judicial remedies." *Wimberly*, 635 So. 2d at 211. *See also Gallant Invs., Ltd. v. Illinois Cent. R. Co.*, 7 So. 3d 12, 20 (La. App. 1 Cir. 2/13/09) (stating that this "category encompasses situations where an innocent plaintiff has been lulled into a course of inaction in the enforcement of his right by some concealment or fraudulent conduct on the part of the defendant"). Under the fourth category, "prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based." *Wimberly*, 635 So. 2d at 211. For both categories, "prescription … does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable." *Id*. at 211-12. The Court finds *contra non valentum* does not apply in the case at bar.

31

The third category does not apply because Billie Lou has not shown Kay engaged in conduct that prevented Billie Lou from availing herself of judicial remedies. Certainly, the record demonstrates that Kay refused to communicate with Billie Lou and did not tell her the actions she was taking or intended to take with the Rolls Royce. However, Kay informed Billie Lou on October 2, 2020, that she had changed the locks. Moreover, Kay's silence would not prevent Billie Lou from learning Kay was withholding possession from her. Kay never suggested she was safely securing the Rolls Royce for Billie Lou, and, in fact, Billie Lou appears to have been on guard that Kay was continuously withholding possession from her as evidenced by her communications to other family members. Nothing in the record suggests Kay falsely cajoled Billie Lou into thinking Kay would protect her alleged ownership interest. Kay's actions thus would not have prevented Billie Lou from learning of the alleged conversion. As discussed above, a reasonable inquiry would have revealed that Kay was acting adversely to Billie Lou's interests. Any ignorance of the conversion appears to result from Billie Lou's own inaction rather than the external actions of Kay, so this category does not apply. Nor would *contra non valentum* apply under the "discovery rule." Kay informed Billie Lou of the lock change on October 2, 2020, and a reasonable inquiry would have revealed Kay was acting adversely to Billie Lou's alleged ownership interest.

Again, the Court notes that a conversion does not only occur when a defendant sells the plaintiff's property. Instead, a conversion begins when a defendant takes an act in derogation of the plaintiff's property interest. Kay took such an action on October 2, 2020, and Billie Lou was fully aware of the lock change. The Court finds that Billie Lou's subsequent actions demonstrate Billie Lou was aware of a potential conversion such that any argument that Kay "concealed" a cause of action or that Billie Lou could not have discovered an alleged conversion is without

merit. Accordingly, Billie Lou has not met her burden of establishing an exception for prescription, and this claim has prescribed. It is thus **DISMISSED WITH PREJUDICE**.

### B. Donation *Inter Vivos*

Alternatively, even assuming *arguendo* this cause of action has not prescribed, Billie Lou did not meet her burden of establishing a donation *inter vivos*. A donation *inter vivos* "is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it." La. Civ. Code Art. 1468. A donation *inter vivos* of a corporeal movable, like the Rolls Royce, can be "made by delivery of the thing to the donee without any other formality." La. Civ. Code Art. 1543. The donation *inter vivos* must be accepted by the donee during the lifetime of the donor. La. Civ. Code Art. 1544. Acceptance can be made in writing, in the act of donation, or by the donee's corporeal possession. *Id*. Delivery of a corporeal movable can effectuate a change in ownership. *Pardue v. Turnage*, 383 So.2d 804, 805 (La. App. 1st Cir. 1980).

To show a valid manual gift (donation via delivery), the donee has the burden of establishing by strong and convincing proof "that the donor had the intent to irrevocably divest himself of a thing and that delivery was made." *Succession of Goodwin*, 353 So.3d 415, 420. The evidentiary standard for a donation *inter vivos* by manual gift is a heavy burden that is often difficult to meet. "Important in proving a manual donation are the donor's outward acts, together with any admissible evidence of the relationship of the parties." *Id*. The burden of proof under the strong and convincing standard is the same burden as under the clear and convincing standard. *Succession of Bargeman v. Bargeman*, 2022-817 (La. App. 3d Cir.); *Succession of Woolfolk*, 225 La. 1 (1954). In sum, the donee must establish both the donor's intent to donate and actual delivery.

The following is a timeline of important events related to the donation *inter vivos*:

| Timeline of Events | |
|---|---|
| **September 20-24, 2020** | Travis purchases the Rolls Royce. He tells Miranda he wants a Rolls Royce for Louisiana and Florida. He tells Matt and Jeff he wants to use the Rolls Royce as "leverage." |
| **September 24, 2020** | Travis presents the Rolls Royce to Billie Lou. Both Matt and Pam witness this presentation. |
| **September 25, 2020** | Travis insures the Rolls Royce in his name and Billie Lou's name. He does not tell Doug about the presentation and tells the insurance agent he bought the car to get his wife to come back to him. Travis gives Billie Lou both sets of keys, and they drive the Rolls Royce to a restaurant. Billie Lou leaves the Rolls Royce at Travis's home. |
| **September 26, 2020** | Billie Lou drives the Rolls Royce to her house with Travis. She asks to store the Rolls Royce at his house, and he agrees. She keeps both sets of keys. |
| **September 27, 2020** | Billie Lou texts Travis that she will bring him his pills when she comes over to detail her |

| | |
|---|---|
| | Rolls Royce. |
| | Maria visits Travis, and Travis tells her is letting Billie Lou use the Rolls Royce and that Billie Lou has the keys. |
| **September 28, 2020** | Luke visits Travis to help him title the car. Travis tells Luke he does not want to title the car in Billie Lou's name. Luke overhears Travis tell Billie Lou it is not her car yet. She goes over to visit Travis later. |
| | Billie Lou and Travis get in a fight over text. Travis says he is trying to wheel and deal, and she is one of the wheels. Billie Lou tells him to give the Rolls Royce to Luke. She goes over to his house to detail the Rolls Royce. |
| **September 29, 2020** | Billie Lou gives Travis a set of keys. |
| **September 30, 2020** | Billie Lou tells Travis she is letting Pam keep the Rolls Royce at Pam's house and tells Pam she can drive the Rolls Royce. |
| **October 1, 2020** | Billie Lou and Travis exchange texts about her recovery from surgery. |
| **Sometime between September 25, 2020, and October 2, 2020** | Pam and Billie Lou visit Travis. Pam asks to drive the Rolls Royce. When Travis learns Billie Lou has the keys, he gets upset and tells |

35

| | her it is not her car. Billie Lou throws the keys. |
| --- | --- |
| October 2, 2020 | Travis dies. |

First, the Court finds Billie Lou did not meet her burden of proving Travis's intent to irrevocably divest himself of the Rolls Royce. The record shows Travis presented the Rolls Royce to Billie Lou on September 24, 2020. In the days thereafter, Billie Lou received the keys, drove the car, cleaned it, and offered to let Pam use it. The Rolls Royce largely remained at Travis's house. Billie Lou testified that Travis never told her the Rolls Royce was not hers. However, both Luke and Pam testified that Travis told Billie Lou the Rolls Royce was not her car yet. Further, Maria testified that Travis told her he was just letting Billie Lou use the car. The Court finds the testimony of these witnesses credible such that it makes Travis's intent to irrevocably divest himself of the Rolls Royce highly questionable.

Additionally, Travis's own actions both before and after the presentation make his intent questionable. Prior to the presentation, Travis told Matt he planned to use the Rolls Royce as leverage, and he told Miranda that he wanted a second Rolls Royce to have one in Louisiana and one in Florida. Such statements indicate Travis intended to maintain a degree of possession and control over the Rolls Royce. Further, only a day after the presentation, Travis insured the vehicle in both his and Billie Lou's name. The fact that he insured the vehicle under his name as well, and not Billie Lou's alone, strongly suggests he intended to maintain a form of possession over the car. Further, Luke testified that Travis did not want to title the car in Billie Lou's name, indicating that Travis did not intend to irrevocably divest himself of the Rolls Royce by giving it to her. The Rolls Royce also remained at Travis's house for most of the time he was alive, and he

retained a set of keys. While Billie Lou testified that she gave him the set of keys so he could move it while she stored it at his home, other witnesses, such as Luke and Pam, testified that Travis was angry with Billie Lou for having the keys. In sum, Travis's actions, especially when viewed in conjunction, cut against an intent to gratuitously and irrevocably divest himself of the Rolls Royce in favor of Billie Lou. Rather, his actions suggest he treated the car as his own and intended only to let Billie Lou use it.

Ultimately, the record demonstrates a significant amount of evidence from credible witnesses supporting a finding that Travis did not have donative intent. Again, the Court notes that this burden is a heavy one. Billie Lou has testified to Travis's donative intent, but the testimony of other credible witnesses and Travis's own actions indicate the lack of donative intent. Billie Lou thus has not met her burden of establishing, by strong and convincing proof, donative intent.

Finally, the Court finds Billie Lou has not established the element of delivery by strong and convincing evidence. For delivery of a corporeal movable, courts consider whether "the will of the donor to give and the actual possession of the movable property by the donee operate simultaneously." *Succession of Miller*, 405 So. 2d 812, 813 (La. 1981). Here, Billie Lou has proven neither Travis's intent nor her actual possession. As expressed above, Billie Lou has not shown, by strong and convincing evidence that Travis intended to give her the Rolls Royce. Rather, the record suggests Travis intended only to let her use the Rolls Royce. For delivery specifically, the record establishes Billie Lou did possess a set of keys to the Rolls Royce but the reasons for that possession are disputed. Maria testified that Travis let Billie Lou "use" the Rolls Royce, and Pam testified that Travis expressed outrage when he learned Billie Lou had the keys. The Court finds that the testimony of these witnesses is credible such that Billie Lou has not

37

established by strong and convincing evidence that Travis intended to effectuate delivery when he gave her the keys. Billie Lou did drive the Rolls Royce and park it at her house for a few hours, but such uses are entirely consistent with the testimony of Pam and Maria that Travis was letting Billie Lou "use" the Rolls Royce and that it was "not her car yet." Accordingly, Billie Lou has not proven delivery of the Rolls Royce as required for establishing a donation *inter vivos*.

In conclusion, Billie Lou has not met her burden of establishing a donation *inter vivos* and has not proven her ownership of the Rolls Royce. Accordingly, her claim that Kay converted her property is without merit and must be dismissed. *See Zaveri v. Condor Petroleum Corp*., 27 F. Supp. 3d 695, 708 (W.D. La. 2014) (stating that "[t]he Louisiana Supreme Court has reiterated the necessity of ownership of the thing, for a plaintiff to establish a conversion action").

## III.    CONCLUSION

In accordance with this Opinion, the Court finds Billie Lou's claim is prescribed. Alternatively, the Court finds that Billie Lou has not met her burden of proving a donation *inter vivos* by manual gift and thus her conversion claim and any claims for declaratory relief relating to the validity of such donation are without merit. Accordingly, this matter is **DISMISSED WITH PREJUDICE.**

MONROE, LOUISIANA, this 1st day of November 2023.

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

38